IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| **JORGE AYALA,** | 11-CV-05708-YGR |
| Petitioner, | **ORDER GRANTING PETITION AND REMANDING CASE FOR NEW TRIAL** |
| **v.** | |
| **GREG LEWIS, Warden,** | |
| Respondent. | |

Now before the Court is petitioner Jorge Ayala's first amended petition for a writ of habeas corpus. (Dkt. No. 19, Petition.)[1] Petitioner claims that (i) the trial court violated petitioner's fifth, sixth and fourteenth amendment rights to a fair jury trial and due process of law by failing to hold an evidentiary hearing after several jurors expressed fear of walking to the parking garage because they allegedly observed one or more individuals, including a witness, staring at them and petitioner's mother milling about the jury assembly area also staring; and (ii) petitioner's conviction of second degree murder was not supported by sufficient evidence in violation of the fifth and fourteenth amendments.

---

[1] The government answered on November 23, 2016, (Dkt. No. 29), and petitioner filed a traverse in reply on April 14, 2017. (Dkt. No. 38.)  On September 5, 2017, the Court ordered supplemental briefing to address the impact of the Ninth Circuit's recent *en banc* opinion in *Godoy v. Spearman,* 855 F.3d 985 (9th Cir. 2017), on Mr. Ayala's petition.  (Dkt. No. 40.) The parties filed supplemental briefs on September 18, 2017. (Dkt. Nos. 41 and 42.)

1    Based thereon, petitioner seeks a writ of habeas corpus.[2]  Having carefully considered the

2    petition and the papers submitted, and for the reasons stated below, the petition for such relief is

3    **GRANTED**.

4    **I.    BACKGROUND**

5        On December 7, 2006, a Santa Clara jury found petitioner Ayala and co-defendant Robert

6    Sanchez guilty of first-degree murder, aggravated assault, and attempted murder. The jury also

7    found true firearm and gang enhancement allegations.  (Dkt. No. 29, Exh. 1, 9 Clerk's Transcript

8    ("CT") at 2138-46, 2149, 2157, 2165.)  On November 5, 2007, the trial court sentenced petitioner

9    to an indeterminate term of 50 years-to-life plus a consecutive determinate term of 20 years and

10   eight months in state prison.  (*Id*. at 2319-26.)

11       On October 28, 2008, petitioner appealed to the California Court of Appeal (Dkt. No. 29,

12   Exh. 3.)  On January 13, 2010, the California Court of Appeal reduced petitioner's first degree

13   murder conviction to second degree murder. (Dkt. No. 33, Exh. 6 ("Court of Appeal Opinion") at

14   2, 40-41.)  The California Court of Appeal denied the habeas petition.  (*Id.*)  In addressing the

15   petitioner's claims on appeal, the California Court of Appeal summarized the relevant facts as

16   follows:

17   *A. The Trial*

18            *1. Preliminary Expert Evidence of Gang Culture*
19            The prosecution's overall theory was that Sanchez and Ayala were
             members of a gang that had planned the crimes in retaliation for a prior
20            attack upon a fellow gang member. San Jose Police Officer Gregory
             Lombardo testified as an expert on Hispanic gangs and local gang culture.
21            He explained that the Norteño and Sureño gangs are enemies. The rivalry

22   _____
         [2] Petitioner also requests that the Court take judicial notice of documents filed as exhibits
23   with the petition. In light of the government's non-opposition, the Court **GRANTS** petitioner's
     request for judicial notice, but does not accept the truth of any matters asserted in the documents.
24   The Court gives such documents their proper evidentiary weight.
         Petitioner further requests that the Court issue an order to show cause, directing the state
25   of California to show cause as to why this petition should not be granted.  In light of this order
     granting Ayala's petition, the request for an order to show cause is **DENIED** as moot.
26       Petitioner also asks for an opportunity to conduct discovery on facts contained in the
     petition and present evidence at an evidentiary hearing.  Petitioner has made no showing as to
27   why discovery or an evidentiary hearing is warranted. The Court therefore **DENIES** petitioner's
     request for discovery and an evidentiary hearing.
28

                                                    2

between them stemmed from two rival prison gangs, the Nuestra Familia and the Mexican Mafia. Norteño and Sureño are umbrella terms. Local Hispanic gangs identify with one or the other.[3] Norteño gangs are associated with the color red, the letter "N," and the numbers 14 and 4. The Sureños associate with the color blue, the letter "M," and the numbers 3 and 13. Gang members frequently have tattoos that signify their gang affiliation. A tattoo of four dots signifies affiliation with a Norteño gang. Three dots signify affiliation with the Sureños. Norteños refer to Sureños by the derogatory terms "scrapas" or "scraps." Sureños refer to Norteños as "chapete."

Local gangs do not have a lot of money; all they really have is power from their reputations. Reputations are enhanced by intimidating people, by committing violent acts, and by threatening to commit violent acts. "The crazier that act is, the more violent it is, the better the reputation you get." Thus, modern gang confrontations often involve the use of weapons, including guns. It is rare that gangs will settle their differences with fists alone. If a gang member is attacked by another gang, the gang would not go to the police but would retaliate, and "up the ante." "If I get beat up I have to go back out and I got to stab somebody. If I get stabbed I got to go back out and I got to go shoot somebody." Typically, gang members will discuss a planned crime among themselves. Loyalty is highly valued and disloyalty is punished. The gang functions on trust and is very territorial. If someone from one gang enters into the territory "claimed" by the other gang, he or she is likely to be attacked. Olinder Park in San Jose is Sureño territory.

Vario Meadow Fair (VMF) and Vario Norte Catorce (VNC) are "sister" Norteño gangs in the San Jose area. The two gangs are on friendly terms and their members often socialize together. Sanchez and Ayala belonged to VMF. Diaz was a member of VNC. Frankie Duran, Isaac Cortinez, Joseph Rojo, Javier Ayala (defendant Ayala's brother) and Jesse Salinas all belonged to either VMF or VNC. Jonathan Pipkin had many friends who were Norteño gang members but he did not belong to a gang.

### 2. The Stabbing of Javier
Sometime prior to the April 2003 murder, Pipkin had been driving a car in which Javier was a passenger. He was stopped at a stoplight when several men dressed in blue San Jose Sharks jerseys got out of a nearby car and approached Pipkin's car. One of the men reached in and stabbed Javier. The VMF gang members later speculated that the attackers had mistaken

[3] The Court notes that the California Court of Appeal's description of Hispanic gangs "Norteño" and "Sureño" as "umbrella terms" is not quite accurate, although it is unclear whether that was taken from the transcript. Rather, Norteños and Sureños are the street gangs which are affiliated with Nuestra Familia and the Mexican Mafia, respectively, each of whom operates in state and federal prisons.

Javier for his brother, defendant Jorge Ayala, who had a reputation for fighting with Sureños.

### 3. The Post-stabbing Meeting

Mary Mendoza's house on Longacre Court had become a gang hangout after Sanchez started staying there early in 2003. Jose Aguilar, who was not a gang member, was Mendoza's roommate. Aguilar testified that he was present in an adjacent room at Mendoza's house while a number of gang members met to discuss the stabbing of Javier. Diaz, Salinas, Duran, Rojo, Pipkin, and Ayala were present. Aguilar did not recall Sanchez being present for that meeting.

Aguilar overheard more than one person at the meeting say that the gang needed to retaliate because a "homey" had been stabbed by a "scrap." Someone said something to the effect that "[w]e're gonna blast 'em or kill them or fuck these scraps." The gist of the conversation was that the gang needed to do a "jale" or "put in work" on their enemies, which meant "you know, beat somebody up. Go kill somebody, stab somebody. Can you go do some sort of crime." More than one voice said that the scraps should be "killed." The voices referred to Javier as a "friend" or "homeboy," not a brother. Aguilar was certain it was Duran he heard talk about the need to "blast a scrap" although it was later determined that Duran had been in custody around this time. Duran and Diaz commonly bragged about killing people. In addition to the voices calling for retaliation, Aguilar heard at least one voice stating that retaliation was "stupid." But another responded with something like, "no, fuck that, we gotta go put in work with these scraps, or we gotta do this."

Pipkin was present at a meeting among the gang members at Mendoza's house a day or two after Javier was stabbed. He believed Sanchez had been there along with Ayala, Diaz, Salinas, Rojo, and Cortinez. Pipkin recalled Diaz advocating retaliation but did not hear him say anything about shooting anyone. Pipkin testified that he thought the idea of retaliation was "stupid." Others present at the meeting disagreed with the retaliation idea, too. Pipkin was not sure who the dissenters were.

### 4. The Shooting

On April 24, 2003, within a week after the meeting at Mendoza's house, Diaz asked Aguilar to give him a ride. Aguilar initially refused but Diaz persisted and Aguilar finally agreed. Diaz and Sanchez got into Aguilar's car and, just as Aguilar started the engine, Salinas and Rojo jumped in. Aguilar drove the foursome, at Diaz's direction, to a place near Olinder Park. There was little discussion along the way. Aguilar did not hear any reference to a "jale" and did not see a gun.

Aguilar dropped his passengers off near Olinder Park. When Aguilar asked if they needed a ride home the men told him not to worry about it. About a minute or two after Aguilar turned toward home, he saw Pipkin

driving toward him. Ayala was in the car with Pipkin. Aguilar wondered why the others had asked him for a ride when their friends, Ayala and Pipkin, were going the same way.

Also on April 24, 2003, Luis and Jimenez walked to Olinder Park to meet their friend Diana L. Luis testified that on the way to the park they came across three men who stared them down as if they wanted to fight. The boys continued on into the park, saying nothing, but the three men continued staring at them. When the boys did not find Diana in the park, Luis called her. Diana received the call around 6:40 p.m. She had noted the time because she was supposed to be home that night at 7:00 p.m.

Diana soon arrived and gathered with the two boys at the picnic tables. The men were still staring so the three friends decided to move to the other side of the park to get away from them. Jimenez wanted to go to another playground where there were more people but when they got near they found the gate to that playground was locked. Then, two of the men who had been staring approached, called the boys "chapetes," and asked if they did drugs or "claimed." The boys replied that they did not claim and were not chapetes. Luis explained that, although he had grown up surrounded by Sureños, on the date of the shooting he was not a gang member. He acknowledged that he and Jimenez both had tattoos of three dots, which was a "Sureño-type" tattoo. Luis knew nothing about a stabbing a week or so prior to his encounter with the men at Olinder Park.

The two men acted friendly and seemed to want the boys to admit that they were Sureños. They invited the boys to go find some chapetes to beat up, suggesting that the men were Sureños themselves. Luis found this odd since one of the men was wearing red shoes, which a real Sureño would never do. Diana recalled that one man said that he "claimed blue" and that both made statements suggesting that they were members of a Sureño gang.

While the conversation about chapetes was taking place, Diana saw a third man hiding in the bushes a short distance away. The two men who had been talking to the boys eventually went to join the third man in the bushes and the three talked among themselves. Soon, the first two men returned and one said, "Let's do it." They then attacked Jimenez and Luis with hands and feet. Luis identified Sanchez as the one who beat him. Luis fell to the ground; his hood was pulled up over his head so he could not see what was happening to Jimenez but he did hear Jimenez say, "Leave him alone" and "We don't bang."

While the attack upon Jimenez and Luis was taking place, Diana saw the third man pop out of the bushes with a gun in his hand. Diana ran, yelling for someone to call the police. She was running away calling for help when she heard a gunshot. Immediately after the gun went off, the assailant who was beating Luis stopped his attack. Luis looked up and saw

one of the men, the one with a teardrop tattoo or birthmark near his eye and a tattoo of cursive handwriting on the back of his neck, bending over a gun as if to reload it. (Sanchez has the name "Josephine" tattooed in cursive letters across the back of his neck.) Luis ran. When he turned to look back he saw the three men jumping over a fence. Jimenez was on the ground.

Meanwhile, that same evening, Pipkin and Ayala had been driving in Pipkin's car when Ayala got a call on his cell phone, following which Ayala asked Pipkin if he could pick up some of the "homies" at Olinder Park. Pipkin got off the freeway and headed to the park. On the way, Ayala received two or three more phone calls. Indeed, he was on the phone "almost constantly." At one point he heard Ayala ask, "where you at?" Pipkin was concerned about going to Olinder Park because he knew it was Sureño territory. Pipkin drove around the perimeter of the park for about 10 minutes looking for Ayala's friends. He could have been in the area for as long as 40 minutes.

Just as Pipkin was getting frustrated and ready to leave the area, Diaz, Salinas, and Sanchez appeared and jumped in the backseat of the car. They slouched over as if they were hiding and instructed Pipkin to drive them to Amelia Ruiz's house, which was a gang hangout. Pipkin complied and then he and Ayala went on their way. Pipkin later returned and dropped Ayala off at Ruiz's house where Diaz, Sanchez, and Salinas were still convened.

Pipkin later learned that someone had been killed at Olinder Park the day he had picked up Diaz, Sanchez, and Salinas there. Pipkin had not asked any questions of his friends because he did not want to know what the gang was up to. At trial, having testified against the gang, he was afraid for his life.

A man walking in Olinder Park on the night of the shooting reported having passed by three men, one of whom was yelling into a cell phone. The man walked past the threesome and shortly thereafter heard what sounded like a firecracker. He then saw a girl running in his direction and four men running away from the area of the shooting.

### 5. Events Post-shooting
Later in the evening of April 24, 2003, Diaz, Salinas, Rojo, and Sanchez went to Mendoza's house and spent the night there. The next morning, Diaz and Sanchez went out for a newspaper. The newspaper contained an article about the shooting and a police sketch of the suspects. Sanchez said to Mendoza, "look at these three fools" and what they had done. He asked, "If it was us, you wouldn't tell on us, would you?" Mendoza thought he was joking. Sanchez continued to follow the story in the newspaper over the next several days.

On April 27, 2003, Ayala spoke by telephone with Duran, who was then in custody in county jail. Duran asked Ayala about the injuries Javier sustained in the stabbing and Ayala told him that Javier had not even gone to the hospital. Duran then asked, "[W]as that shit the homies?" To which Ayala replied, "Hell yeah boy."

Duran told Ayala, "Tell that fool, I said get another, get a bigger tattoo fool . . . Tell that fool Tiny [Diaz] I said get a tattoo."

An autopsy showed that Jimenez had been killed instantly by a single shotgun blast to the chest fired from approximately three feet away. An unusual plastic wadding was recovered from Jimenez's chest, along with a large number of shotgun pellets. It was later determined that the plastic wadding was unique to certain shot shells manufactured by Fiocchi, of Italy. No spent shotgun cartridges were found at the scene.

Police officers searched Mendoza's house on May 9, 2003. Diaz was present and was arrested. Police recovered two shotguns, one of which had a pistol grip and had been sawed off, marijuana, methamphetamine, baggies, scales, and Fiocchi shotgun shells that contained the same kind of plastic wadding found in Jimenez's body. Sanchez was arrested May 14, 2003. Jail officers later intercepted a letter from Sanchez to Diaz, complaining that Pipkin had been speaking with the police. Sanchez told Diaz not to worry because the gang would hire a lawyer for Diaz. He closed the letter with, "One love one heartbeat."

### 6. Cell Phone Evidence

Records for the cell phones belonging to Diaz and Ayala showed many calls between them beginning around 6:02 p.m. and continuing until about 7:15 p.m. on the evening of the shooting. Ayala's phone records showed that at 6:17 p.m. on April 24, 2003, he made a call that was routed through the Olinder Court cellular tower near Olinder Park. The tower has a range of about one and one-half miles. Diaz's cell phone records revealed that, until about 6:39 p.m. that evening, his phone was located near Longacre Court but between 6:40 and 7:06 p.m., his phone was involved in three calls routed through the Olinder Court tower. Diaz's cell phone directory contained the names of several gang members, some listed by nickname. The entry for "Hitman" corresponded to Sanchez's home telephone number.

### 7. Further Expert Testimony

In addition to his testimony pertaining to gang culture and local gangs in general, Officer Lombardo testified about defendants' gang affiliations and the gang-related aspects of the crimes in this case. He explained that both defendants were known gang members. They showed their gang affiliation with their tattoos, among other things. Sanchez had several gang-related tattoos, including the words "Norte," "Vario M F," "San Ho," and "Fuck the World" in various places on his upper body. He also had a tattoo of the number "863," which corresponds to the letters VMF on a

cell phone, four dots on the knuckles of his left hand, and the letter "X" and the number "4" on his face next to his left eyebrow. While the trial was in progress, Sanchez was found in possession of a handwritten document that explained the history of the Nuestra Familia prison gang and described the Sureños as enemies of the Norteños. According to Lombardo, Sanchez's possession of the document showed his continued interest in the Norteño lifestyle. Ayala also had a number of gang-related tattoos, including four dots on his hand, "XIVMF" in large block letters across his chest, and a shark with the words "San Ho" tattooed on his torso.

The prosecutor posed a lengthy hypothetical describing the crimes according to the prosecution's theory of the case and asked the expert if, under the circumstances described, he believed the crimes had been committed for the benefit of or at the direction of the gang. Lombardo responded that he believed the murder was done "at the direction of the gang" because the meeting at Mendoza's house followed the incident where Javier was stabbed and the gang "actually talk[ed] about what they are going to do and possibly plan[ned] it out at that time. That shows me that there is some direction there. Based on the evidence in this hypothetical situation, this entire operation—and I call it that because it was executed like a proper operation. There was a drop-off person, people committing the crime. There was somebody else picking them up. Telephone communication. It sounds to me like it was done actually very well, if you look at it from that standpoint. Everything went flawless. That shows me that there is some direction there, that this wasn't a spontaneous act. It's just too smooth, too well orchestrated, to be something spontaneous like that." Lombardo later elaborated, stating that the circumstances described showed that the attack at Olinder Park was "preplanned," that it "had some thought put into it," that the "participants" most likely "had distinct roles to make it work properly," and that the plan had gone "pretty flawless." Therefore, it was Lombardo's opinion that the crimes had been committed at the direction of the gangs.

### 8. The Defense

The defense theory was that Diaz was violent and unpredictable and that defendants did not know he was planning to kill and did not know he had taken a gun to Olinder Park. Pipkin had testified that Diaz was impulsive and unpredictable; he also had a reputation as a violent person, although Pipkin had never known him to use a gun. While in prison, Diaz had twice stabbed fellow inmates and once blew a contraband dart at another.

Ayala pressed the theory that he was not a particularly committed gang member. His neighbor, Simon Ortiz, stated that he knew Ayala to be a hard worker. He knew that Ayala was affiliated with VMF but he did not believe Ayala was obsessed with the gang. Ayala's mother, Benita Ayala, said that her son lived at home and worked for UPS and sometimes for his father's landscaping business. She recalled her other son, Javier, having

1  suffered a minor injury to his right upper chest sometime in April 2003.
2  The injury did not bleed or swell and was not serious.

3  (Court of Appeal Opinion at 3-12.) On April 22, 2010, petitioner filed a petition for review in the

4  California Supreme Court, (Dkt No. 33, Exh. 7), which the California Supreme Court denied. (*Id*.,

5  Exh. 8.)

6  Petitioner filed a petition for writ of certiorari in the United States Supreme Court on July

7  20, 2010, and the United States Supreme Court denied the petition. (*Id.*, Exh. 9.) On November

8  29, 2011, Ayala filed a petition in this Court. (*Id.*, Exh. 7.) The Court granted petitioner's

9  request for a stay to allow petitioner to exhaust state remedies. (Dkt. No. 7.)

10  On April 22, 2013, petitioner filed a petition for writ of habeas corpus in the California

11  Supreme Court, and on June 12, 2013, the California Supreme again denied the petition. (*Id*.,

12  Exh. 10.) On October 19, 2016, this Court dissolved the stay. (Dkt. No. 25.)

13  **II.  APPLICABLE STANDARDS OF REVIEW**

14  A federal court may entertain a petition for a writ of habeas corpus on behalf of a person in

15  state custody "only on the ground that he is in custody in violation of the Constitution or laws or

16  treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death

17  Penalty Act ("AEDPA") of 1996, section 2254(d)(1), a state prisoner can obtain habeas relief

18  regarding a claim adjudicated in state court only if the adjudication "(1) resulted in a decision that

19  was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as

20  determined by the Supreme Court of the United States; or (2) resulted in a decision that was based

21  on an unreasonable determination of the facts in light of the evidence presented in the [s]tate

22  court proceeding." *Id*.

23  A state court decision is "contrary to" clearly established federal law, as determined by the

24  Supreme Court, only if "the state court arrives at a conclusion opposite to that reached by [the

25  Supreme] Court on a question of law or if the state court decides a case differently than [the

26  Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S.

27  362, 412–13 (2000). A state court decision is considered an "unreasonable application" of clearly

28  established federal law, as determined by the Supreme Court, if it correctly identifies a governing

legal principle from a Supreme Court decision but "unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. A federal court reviewing a habeas petition cannot issue the writ "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411. Rather, a federal court may grant the writ only if they find the state court decision was contrary to or an unreasonable application of a clearly established federal law. *Id*. at 412–13. The Supreme Court has ruled that the petitioner has the burden of showing that a state court decision is an objectively unreasonable application of clearly established federal law. *See Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Harrington v. Richter*, 562 U.S. 86, 98, 101–03 (2011).

AEDPA requires a highly deferential standard for evaluating state court rulings and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *see also Lindh v. Murphy*, 521 U.S. 320, 334 n.7 (1997). "[A] habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Harrington*, 562 U.S. at 102. A federal court should only grant relief due to a constitutional error of the state court when the error was not harmless, that is, only if it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 638 (1993).

## III. RIGHT TO A FAIR AND IMPARTIAL JURY

### A. LEGAL FRAMEWORK

Pursuant to the Sixth and Fourteenth Amendments, a criminal defendant has the right to trial by an impartial jury. *See* U.S. Const. amend. VI; *Turner v. Louisiana*, 379 U.S. 466, 472–73 (1965) (applying the Sixth Amendment right to the States via the Fourteenth Amendment). This includes the "right to a verdict by impartial, indifferent jurors to avoid any bias or prejudice that might affect the defendant's right to a fair trial." *U.S. v. Simtob*, 485 F.3d 1058 at 1064 (9th Cir. 2007) (quoting *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).) "Improper influence or bias of a single juror would affect that right." *See United States v. Gonzalez*, 214 F.3d 1109, 1111

(9th Cir. 2000). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips,* 455 U.S. 209, 217 (1982).

"Private communications, possibly prejudicial, between jurors and third persons, or witnesses . . . are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Mattox v. United States*, 146 U.S. 140, 150 (1892). "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . ." *Remmer v. United States*, 347 U.S. 227, 229 (1954). "Because jury tampering cuts to the heart of the Sixth amendment's promise of a fair trial, we treat jury tampering very differently than other cases of jury misconduct. Once tampering is established, we presume prejudice and put a heavy burden on the government to rebut the presumption." *United States v. Dutkel*, 192 F.3d 893 at 894 (9th Cir 1999). The Ninth Circuit's recent *en banc* decision in *Godoy* is instructive:

> [W]hen faced with allegations of improper contact between a juror and an outside party, courts apply a settled two-step framework. At step one, the court asks whether the contact was 'possibly prejudicial,' meaning it had a 'tendency' to be 'injurious to the defendant.' *Mattox*, 146 U.S. at 150. If so, the contact is 'deemed presumptively prejudicial' and the court proceeds to step two, where the 'burden rests heavily upon the [state] to establish' the contact was, in fact, 'harmless.' *Remmer*, 347 U.S. at 229. If the state does not show harmlessness, the court must grant the defendant a new trial.

*Godoy,* 861 F.3d 956, 959 (9th Cir. 2017). The Ninth Circuit went on to state that "the defendant's burden at step one to show a possibility of prejudice is not onerous." *Id*. at 969; *see also Tarango v. McDaniel,* 837 F.3d 936, 949 (9th Cir. 2016) (describing defendant's burden as a "low threshold"). Rather, the defendant "need only demonstrate [that] a *credible risk"* of prejudice exists. *Id*. (Emphasis in original.) Once a defendant shows a "possibility of prejudice," the trial court must "determine the circumstances [of the possibly improper contact], the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer*, 347 U.S. at 229-230; *see also Godoy,* 861 F.3d at 959.

However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith,* 455 U.S. at 217. "*Remmer* and *Smith* do not stand for the proposition that *any time* evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias . . . ." *Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003) (emphasis in original). Not every allegation of possible jury misconduct "requires a full-dress hearing." *United States v. Angulo*, 4 F.3d 844, 847 (9th Cir. 1993). To comply with *Remmer* and *Smith*, courts must "determine the effect of [prejudicial] occurrences when they happen" and decide whether further inquiry is necessary based on "the nature and timing of the bias." *Tracey*, 341 F.3d at 1044-45 (quoting *Smith*, 455 U.S. at 217).

## B.  BACKGROUND

Petitioner claims that the trial court erred by failing to hold an evidentiary hearing to determine whether any of the jurors had been improperly influenced. In addressing the petitioner's claim on appeal, the state court summarized the relevant facts as follows:

> After learning from the bailiff that the jurors had been concerned that the defense witnesses Ortiz and [Mrs.] Benita Ayala had been "watching" them outside the courtroom, the court arranged for the jury to be escorted to their cars that evening. The court told counsel about these events the next day. Defense counsel moved for a mistrial, or in the alternative, requested an evidentiary hearing under *Remmer v. United States* (1954) 347 U.S. 227 (*Remmer*), in order to decide if the jurors had been prejudiced by the witnesses' conduct. The trial court denied the mistrial motion and rejected the request for a hearing, although the court did question the bailiff in the presence of counsel.

> The bailiff explained that two of the female jurors had become fearful when they observed Ortiz and one or two other people watching them get in their cars at the end of the day. Two other jurors also expressed concern. The jury also told the bailiff that [Mrs.] Ayala and her family members had been present in the jury area. The bailiff had promptly consulted with the court and, as the court explained to counsel, the court responded by arranging for the escorts. The court had directed the deputies not to say anything to the jury other than that the escort was a "routine precaution." Ayala's counsel informed the court that Ayala's father had been called for jury duty, which could have explained Benita Ayala's presence in the jury assembly area.

> In declining to hold an evidentiary hearing, the court stated, "I cannot see what an evidentiary hearing would add to our factual background. There's

grave danger in that [an] evidentiary hearing [] compounds whatever problem, if any, we already have." The court noted that both Ortiz and [Mrs.] Ayala were entitled to be where the jury had observed them. "But even if the mere presence of Mr. Ortiz and M[r]s. Ayala amounts to some sort of witness or spectator misconduct because of them making themselves deliberately conspicuous to the jurors, there is nothing to me to suggest that one or more--the concern of one or more of the jurors was not an understandable concern or that such a concern elevates to some sort of juror misconduct or denies either defendant a fair trial."

The court then had the jury brought in and the court read the following admonition:

"Yesterday, I was informed by the bailiff that one or more of you had noticed that Mr. Ortiz and/or other persons associated with the trial were present in the parking structure at times that you were going to and from your cars, and that Mrs. Ayala was present in the area of the jury assembly room on the second floor.

"First, let me note that our records indicate that Javier Ayala Senior was summoned for jury duty yesterday. I guess it's fair to say we all have to do it from time to time. That may well account for Mrs. Ayala's presence in or near the jury assembly room. In any event, please put these circumstances from your mind, and do an oath to render a true verdict according only to the evidence, and I further instructed each of you to decide what happened in this case based only on the evidence that was presented to you during the course of the trial.

"Specifically, do not consider the presence or absence of any witnesses, family members, or other persons associated with the trial in or near the courtroom at any time during the trial, except of course if a witness testified, you may consider their evidence as you were previously instructed.

"To help ensure that you are not otherwise distracted during the course of your deliberations, I've made arrangements for you to park together in a new location. You'll be transported together to the courthouse in the morning, and back to your cars at the end of the day. This is a routine response to your concerns, expressed by one or more of the jurors.

"And you may now resume your deliberations. I know you sent us a question, and we're going to get to that in just a minute. . . .

"Finally, reminder: If at any time during the trial, you feel that you are unable to decide the case fairly and impartially according to the law and your oath, please let me know, using our existing procedures.

(Court of Appeal Opinion at 30-32). The state court considered this issue and addressed it as

follows:

Defendants argue that the trial court erred in refusing to hold an evidentiary hearing to determine if any one of the jurors had been improperly influenced. Defendants rely upon *Remmer*, supra, 347 U.S. 227, in which the United States Supreme Court vacated the judgment of conviction and remanded the matter for a hearing because the trial court had failed to inquire into the jury's impartiality upon learning that an unknown person had communicated to one of the jurors that the juror "could profit by bringing in a verdict favorable to the [defendant]." (Id. at p. 228.) The Supreme Court held that the trial court "should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." (Id. at pp. 229-230.) This result was based upon the principle that "any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial . . . . [T]he burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant." (Id. at p. 229.) But "[a]n evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias. [Citation.] Rather, in determining whether a hearing must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source." (*United States v. Angulo* (9th Cir. 1993) 4 F.3d 843, 847.)

In the present case, there was no suggestion that either Ortiz or Benita Ayala had said anything to any of the jurors or made any gestures. At worst, they were alleged to have been "watching" the jurors. And there was an entirely innocent explanation for Benita Ayala's presence in the jury assembly area. This is far less troubling than the cases defendants cite, where the tampering involved an anonymous telephone call in which the caller told the juror, "I know where you live" (*United States v. Angulo*, supra, 4 F.3d at p. 846) and where one juror was repeatedly approached outside the courthouse, promised cash, a job and a new car if he voted to acquit one of the two defendants (*United States v. Dutkel* (9th Cir. 1999) 192 F.3d 893, 894). We do not assume, without more, that a juror's safety concerns demonstrate bias either for or against a defendant. (Cf. *People v. Navarette* (2003) 30 Cal.4th 458, 500.)

The trial court quite reasonably worried that if it were to question the jurors about the incidents it would make the incidents seem more ominous than the jury actually believed them to be. That the jury was not overly concerned is evidenced by the fact that, even as the court and counsel were discussing the issue, the jury had resumed its deliberations and had submitted a question related to the substance of the deliberations and unrelated to the fears the jury had communicated to the bailiff the night before. To the extent that the presence of a defense witness made some of the jurors fearful, the court's safety measures--the morning and evening escort and the opportunity to work through lunch--were designed to quell those fears.

The court's admonition avoided stirring up further fears by assuring the jury that the safety measures were routine and intended to eliminate distractions. It also gave the jury a completely innocent explanation for Benita Ayala's presence in the jury area. Finally, the trial court instructed the jury to inform the court if, at any time, "you feel that you are unable to decide the case fairly and impartially." Absent any further indication of concern from the jury, we presume the jury was able to follow the admonitions it was given. (*People v. Frank* (1990) 51 Cal.3d 718, 728.) Indeed, had the court conducted a hearing, it may well have created concern where none actually existed.

In view of all of the foregoing, we conclude that the trial court did not err refusing to question the jurors and that there is no substantial likelihood any one of the jurors was prejudiced by the incidents. Accordingly, we also reject defendants' claim that the trial court abused its discretion in denying their new trial motion, which was based upon the same grounds.

(*Id*. at 32-34.)

C.    DISCUSSION

Ayala argues that the trial court's failure to hold a *Remmer* hearing deprived him of his Sixth and Fourteen amendment rights to an impartial jury. The core of petitioner's argument is that a hearing should have been conducted given the jurors' expression of fear after the following compilation of occurrences: (a) the repeated testimony and argument that Norteño gang members will "mad-dog" individuals (*i.e.* stare them down as a precursor to fighting); (b) the jurors possible affiliation of Ortiz with the defendant even though the prosecution called him as a witness; (c) Ortiz's choice to park near and repeatedly stare with others at the jurors; and (d) Benita Ayala's presence near the jury assembly room on more than one occasion. Thereafter, the jurors asked for an "escort to their vehicles."[4] (27 Registered Transcript ("RT") at 4713:7-12.) According to petitioner, the trial court was required to hold an evidentiary hearing, applying a strong presumption of prejudice, to determine whether the jurors could remain impartial. The government counters that federal law does not require courts to hold a hearing every time a claim of juror bias is raised, courts have flexibility in determining what steps to take in response to a claim of juror bias and, in any event, petitioner's claim fails because he cannot show prejudice.

As discussed above, *Remmer* and *Smith* grant trial courts some flexibility to determine

---

[4] Petitioner estimates that the jurors' vehicles were parked no more than 100 yards from the courthouse. (*See* Dkt. No. 20 at 17.)

whether an evidentiary hearing is appropriate. *See Tracey*, 341 F.3d at 1044. Not every allegation of possible jury misconduct "requires a full-dress hearing." *Angulo*, 4 F.3d at 847. However, once a defendant shows a mere "possibility of prejudice," the trial court must hold an evidentiary hearing regarding the allegedly improper contact to "determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial." *Remmer*, 347 U.S. at 229-230; *see also Godoy,* 861 F.3d at 959.

      Here, the state court's rejection of petitioner's claim was contrary to *Remmer* and *Smith.* Its determination that no hearing was necessary was not reasonable in light of the "content of the allegations [and] the seriousness of the alleged misconduct or bias." *Tracey*, 341 at 1044. According to the Court of Appeal's summary, jurors in this case "had become fearful when they observed Ortiz and one or two other people watching them get in their cars at the end of the day. Two other jurors also expressed concern." (Court of Appeal Opinion at 31.) The record reflects a more concerning situation. The bailiff advised:

> The jury foreman asked me if they could talk to me about some concerns. I said yes. *Several of them said that they were afraid for their safety* and asked if we could walk them to their cars. At that point, two of the female jurors said that on *several occasions*, and they specifically named Mr. Ortiz by name, that him and his wife -- and they said the other guy, they couldn't really remember his name, had been parked next to their cars, standing next to their car, and watching them enter their car and leave at the end of the day.
>
> They also said that Mrs. Ayala was down in the jury room and that it had happened *on more than one occasion*, and that there were other family members that had been down in the jury room.
> ***
> They expressed fear and asked if there was -- if we could do something to -- they didn't say guarantee, I forgot the exact word, but to *secure their safety* to and from the courthouse.
> ***
> The two [jurors] for sure that had Mr. Ortiz standing at their cars [expressed fear]. And then one -- the older lady, Juror Number 7, and then one of the men, also, Juror Number 10.

(27 RT at 4716-18 (emphasis supplied).) Having expressed fear, not just the presence of Ortiz, Mrs. Ayala, other family members, and "[an]other guy," the four jurors (and potentially other members of jury as the request came from the foreman) were concerned enough for their safety

that they reported the incident to the bailiff and requested an escort. (*Id.*) Once the jury specifically articulated and expressed fear the "low threshold" for demonstrating a "credible risk" of prejudice was easily satisfied. *See Tarango,* 837 F.3d at 949. The trial court misperceived the threshold requirement to conduct a hearing and "determine the circumstances [of the allegedly improper contact], the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer,* 347 U.S. at 229-230; *see also Godoy,* 861 F.3d at 959. Defense counsel even alerted the court to this requirement when counsel moved for a *Remmer* hearing. (27 RT at 4723-24 (arguing that it was "incumbent to . . . find out more information on the basis of the potential prejudice to [his] client").)

Thus, contrary to *Remmer* and *Smith,* the trial court refusal to hold an evidentiary hearing to determine the extent of the various contacts described and whether they were, in fact, prejudicial. Effectively, the trial court swept the issue under the proverbial rug. To do so merely hides the truth; it does not confront the potential prejudice. The courtroom reality of long gang cases contributes to the potential for conflict avoidance. Here, the record suggests such a frame of mind as the trial court appeared relieved that the bailiff had not gathered more specific information. (*Id.* at 4718:19-21 ("The Bailiff: I didn't ask. I didn't get into the details. [¶] The Court: Probably wise.").) Similarly, the use of "magic words" without articulating the factual basis for the court's conclusion does not persuade. (*Id.* at 4728:3-5 ("There's grave danger in that evidentiary hearing and compounds whatever problem, if any, we already have.") The issue was either significant enough to warrant a hearing, as here, or not significant, in which case "grave danger" would not exist and the hearing would have been harmless.

In rebuttal, respondent argues that no hearing was necessary because the trial court judge took prompt action: First, the trial court arranged for the jurors to park together in a new location and be transported to and from the courthouse. Second, the trial court issued a curative instruction that the jurors not allow the incidents involving Ortiz and Benita Ayala to "influence deliberations or decisions in any way." (Court of Appeal Opinion at 32.) The trial court reminded the jurors of their "oath to render a true verdict according only to the evidence," and further instructed them to "decide what happened in this case based only on the evidenced that was

presented to you during the course of the trial." (*Id.*) Third, the trial court conveyed to the jurors that Benita Ayala's presence near the jury assembly room was innocently explained by the fact that her husband had been summoned for jury duty that day. (*Id.*) Finally, the trial court admonished the jurors to inform the court "[i]f at any time during the trial, you feel you are unable to decide the case fairly and impartially according to the law and your oath." (*Id.*)

Respondent does not persuade. None of the actions taken by the trial court satisfied the court's obligation under *Remmer* to "determine the circumstances [of the allegedly improper contact], the impact thereof upon the jur[y], and whether or not it was prejudicial." *Godoy*, 861 F.3d at 960 (quoting *Remmer*, 347 U.S. at 230). As an initial matter, arranging for jurors to park in a new location after several months of trial may actually have heightened the possibility of prejudice by reaffirming the jurors' safety concerns. Just saying it was a "routine" response does not make it so, especially, when the lack of a hearing precluded the trial court from understanding the full nature of the jurors' safety concerns. The instructions themselves focused on two isolated incident rather than the "several" incidents noted to the bailiff. In any event, this logistical arrangement did not relieve the trial court of its obligation to conduct a *Remmer* hearing. Similarly, defendants cite no authority for the proposition that issuing a curative instruction and admonishing jurors is a constitutionally sufficient substitute for a *Remmer* hearing.

In his supplemental brief, respondent argues that petitioner failed to offer evidence of "possibly prejudicial juror contact . . . . [because] there were no communications between the witnesses (Ortiz and Mrs. Ayala) and the jurors." (Dkt. No. 42 at 8.) Respondent's argument fails in light of *Simtob* and *Boode*, two cases involving non-verbal jury tampering. *See Simtob,* 485 F.3d at 1060; *Boode v. Johnson*, 2015 WL 1967089 at *1. *Simtob* concerned a juror who complained that she felt threatened when the petitioner had "eye-ball[ed]" her. *Simtob,* 485 F.3d at 1060. There, the Ninth Circuit vacated petitioner's conviction because "[w]ithout any inquiry whatsoever into the juror's state of mind or communications with other jurors, the district court had no way of knowing whether any juror harbored lingering bias from the eye-balling incident." *Id*. at 1065. Similarly, in *Boode*, the district court found that the state court erred in failing to hold a hearing after a juror reported that she had observed the defendant give a "scary stare" to a

1   testifying prosecution witness. *Boode*, 2015 WL 1967089 at *1.

2           Finally, respondent argues in its supplemental brief that "the record shows that the jurors'

3   brief, one-time, chance encounters with each of the two defense witnesses were, in fact,

4   harmless." (Dkt. No. 42 at 9.)  While that could have been a potential conclusion by the trial

5   court, the record indicates multiple encounters and the jurors themselves described the encounters

6   as significant enough to request that the court "secure their safety." (27 RT 4716-18.)

7   Respondent's view is only one possible characterization. While, as respondent notes the jurors did

8   not respond after the "curative instructions" and "continued to deliberate," the record does not

9   establish that the "safety" concerns raised were ever extinguished.  Rather, the record only reveals

10  trial court action which muted the safety concerns.  The trial court did not ask any open-ended

11  questions nor encourage a response to confirm that the safety concerns had not impacted the

12  deliberations.  The record is silent as to the jurors' collective reaction.

13          The Supreme Court and Ninth Circuit have on numerous occasions found harmful error

14  arising from a failure to hold a *Remmer* hearing where members of the jury have not articulated

15  an inability to remain impartial. *See Remmer*, 347 U.S. at 229-30; *Godoy,* 861 F.3d at 970;

16  *Angulo*, 4 F.3d at 848; *Simtob,* 485 F.3d at 1060.[5]  Having concluded [that petitioner] triggered

17  the presumption of prejudice, the next question is whether the state rebutted the presumption by

18  showing [the juror contact at issue was], in fact, harmless." *Godoy*, 861 F.3d at 970 (citing

19  *Remmer*, 347 U.S. at 229). "On the existing record, the state has not made that showing. [The

20  Court] simply [does] 'not know from this record . . . what actually transpired, or whether the

21  incidents that may have occurred were harmful or harmless.'" *Id*. (quoting *Remmer*, 347 U.S. at

22  229). "Because the existing record is unclear as to prejudice, and no evidentiary hearing on

23  prejudice has yet been held," the petition is **GRANTED**.

24          //

25          //

26  _____
        [5] Respondent also takes the position that "there was no evidence that the nonverbal, brief
27  encounters with the two defense witnesses . . . carried any weight with the jurors."  (Dkt. No. 42
    at 7.) The argument effectively ignores the import of the jurors' contact with the bailiff seeking
28  protection.

Given the length of time which has passed, and the parties' agreement that an evidentiary hearing at this point would be pointless, the Court **SETS ASIDE THE VERDICT AND REMANDS FOR A NEW TRIAL.** *See Godoy*, 861 F.3d at 970; *see also Drope v. Missouri*, 420 U.S. 162, 183 (1975).

**IV.    SUFFICIENT EVIDENCE TO SUPPORT CONVICTION**

### A.    LEGAL FRAMEWORK

Due process guarantees that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof -- defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense." *Jackson v. Virginia,* 443 U.S. 307. 316 (1979). Evidence is sufficient to support a conviction when "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id*. (Emphasis in original.) "Circumstantial evidence and inferences" may be sufficient to sustain a conviction." *United States v. Jackson*, 72 F.3d 1370, 1381 (9th Cir. 1995). "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith,* 565 U.S. 1, 2 (2011) (per curiam). "A jury's credibility determinations are therefore entitled to near-total deference under *Jackson.*" *Bruce v. Terhune,* 376 F.3d 950, 957 (9th Cir. 2004).

Pursuant to California Penal Code Section 187(a), "[m]urder is the unlawful killing of a human being . . . with malice aforethought." Section 31 provides that an individual who aids and abets the commission of a target crime is a principal in that crime. To be liable as an aider and abettor, a defendant must form the requisite intent prior to or during the commission of the target crime. *People v. Cooper*, 53 Cal.3d 1158, 1164 (1991). A defendant's presence at the scene of the crime, companionship with the principal, and conduct before and after the commission of the crime are all relevant factors in determining liability. *People v. Salgado*, 88 Cal.App.4th 5, 15 (2001); *People v. Campbell,* 25 Cal.App.4th 402, 409 (1994).

The existence of a conspiracy may be inferred from the relationship, interests, conduct, and activities of the conspirators. *People v. Rodrigues,* 8 Cal.4th 1060, 1135 (1944). A "person does

not become a conspirator merely by associating with one or more persons who are conspirators, nor merely by knowing that a conspiracy exists." *United States v. Weaver*, 594 F.2d 1272, 1274 (9th Cir. 1974). A conspiracy conviction requires "proof that the defendant and another person had the specific intent to agree or conspire to commit an offense, as well as the specific intent to commit the elements of that offense, together with proof of the commission of an overt act by one or more of the parties to such agreement in furtherance of the conspiracy." *People v. Jurado,* 38 Cal.4th 72, 120 (2006) (quoting *People v. Morante,* 20 Cal.4th 403, 416 (1999)).

**B. BACKGROUND**

The state appellate court found that sufficient evidence existed to support petitioner's murder conviction. (Court of Appeal Opinion at 27-29.) The state court articulated the standard of review as follows:

> To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) If the circumstances reasonably justify the jury's factual findings, we must affirm the judgment. (*Medina*, *supra*, 46 Cal.4th 913, 924, fn. 2.)

(Court of Appeal Opinion at 27-28). Applying this standard, the state court found, in relevant part:

> In this case there was evidence that Ayala was present at the meeting at Mendoza's house during which the gangs agreed upon a plan to attack unspecified Sureños in retaliation for the stabbing attack upon Javier. Ayala points out that at least one attendee at the meeting voiced disagreement with the plan, and if we eliminate all those who probably did not dissent, we must conclude that Ayala was the dissenter. But the argument ignores our standard of review. Substantial evidence supports the contrary conclusion. Ayala had a reputation for fighting with Sureños, it was his own brother who had been stabbed, and there had been speculation that defendant Ayala, not Javier, had been the true target of the stabbing. Just days after the crimes were committed, Ayala responded with an unequivocal, "hell ya, boy," when Duran asked him if the "homies" had committed the murder at Olinder Park.
>
> All of this tends to suggest that Ayala did not dissent from the planned retaliation. Furthermore, the dissenter had voiced the opinion that retaliation was "stupid," the very word Pipkin used at trial to describe his opinion of the scheme. Thus, the jury reasonably could have concluded someone other than Ayala, possibly Pipkin, was the dissenter.

Even if Ayala had initially resisted the idea, his dissent was met with, "[N]o, fuck that, we gotta go put in work with scraps." There was also evidence that Ayala was a committed member of the Norteño-affiliated gang, that gangs generally had a habit of retaliating for attacks upon fellow gang members, and that Olinder Park was Sureño territory. Furthermore, the cell phone evidence showed that Ayala was present near Olinder Park before Diaz and Sanchez got there and that he tracked the progress of the crimes--or the location of the perpetrators--during and after the commission of the crimes. In light of all this, any reasonable jury could have concluded that Ayala knew Diaz and Sanchez were going to Olinder Park to carry out an attack upon Sureños and that he made sure a vehicle was available to whisk the perpetrators out of the vicinity as soon as the attack was complete. Thus, the evidence supports a finding that Ayala agreed in advance to the plan and aided and abetted the crimes.

The evidence further supports a finding that Ayala knew or should have known, regardless of the crimes he personally intended, that murder was foreseeable. The discussion at the meeting at Mendoza's house included mention of killing Sureños. Lombardo had explained that retaliatory attacks in the gang context are typically more violent than the precipitating attack and that weapons are commonly used. Diaz was known to be violent and unpredictable and frequently bragged about killing people. Ayala, as a member of the gang, must have known Diaz's propensity to violence. Therefore, he knew or should have known that the perpetrators were likely to bring a gun along and that killing was probable. Thus, there was substantial evidence to support the finding that Ayala conspired to commit or aided and abetted crimes, the foreseeable consequences of which were murder or attempted murder.

(Court of Appeal Opinion at 28-29.)

## C. DISCUSSION

Petitioner argues that insufficient evidence existed to support his conviction. Specifically, petitioner contends that the state court upheld the conviction based on erroneous findings that (i) petitioner was present at a meeting at Mendoza's house during which the petitioner and others agreed to attack Sureños and (ii) petitioner was near the scene of the murder before Sanchez and Diaz arrived.

### i. Presence at Mendoza's House

Petitioner claims that the "lynchpin of the California court's holding" was the erroneous conclusion that "Ayala was present at the meeting at Mendoza's house during which the gangs agreed upon a plan to attack unspecified Sureños in retaliation for the stabbing attack on [Ayala's brother]." (Petition at 35.) Ayala's position is that (i) the term "meeting" is misleading because the gathering was informal, (ii) the testimony did not establish that those present at the gathering

agreed on a plan to attack Sureños, and, even if there was a meeting of the minds, (iii) the testimony did not establish that Ayala agreed to the plan.

While the case hinged on circumstantial evidence, ultimately, petitioner does not persuade. First, whether the gathering at Mendoza's house is characterized as a "meeting" or informal gathering is not material. What matters is whether members of the Norteño gang, including petitioner, were present. Petitioner does not dispute that he was present along with other members of the Norteño gang.

Second, contrary to petitioner's claim, sufficient evidence also existed for the jury to conclude that those present at the gathering agreed on a plan to attack Sureños. Witness testimony indicates that Norteño gang members formulated a plan to "blast" Sureños in retaliation for the stabbing of petitioner's brother. (12 RT at 1444-45, 2465-66, 2505-06, 2516-18, 2521, 2547-51, 2565, 2569; 13 RT at 2620; 16 RT at 3079; 17 RT at 3406-09, 2940, 19 RT at 3937-38.) This is sufficient.

Third, the state court's determination that Ayala agreed to the plan was reasonable because the record shows that petitioner (i) had a reputation for fighting with Sureño gang members, (ii) Pipkin told the investigator during an interview that petitioner did not dissent during the meeting, (iii) petitioner made a statement to another gang member in apparent praise of the murder, and, perhaps most importantly, (iv) the murder was apparently in retaliation for an attack on petitioner's brother. Thus, the state court reasonably determined that substantial evidence supported a finding that petitioner was present at a meeting or gathering during which a retaliatory plan to attack Sureños was formulated, and that petitioner "agreed in advance to the plan . . . ." (Court of Appeal Opinion at 29.)

### ii.    Presence Near Olinder Park

Petitioner next argues that the state court erroneously found that petitioner was present near the scene of the murder prior to the arrival of Sanchez and Diaz based on a faulty analysis of cell phone testimony. According to petitioner, the mere fact that Ayala's cell phone call was routed through a cell phone tower near Olinder Park does not support a conclusion that Ayala was near Olinder Park when the call was made. Petitioner further claims that the cell phone testimony

shows that Ayala was in constant motion leading up the murder, indicating that he was not in fact waiting to pick up Sanchez and Diaz.

Petitioner misconstrues the applicable legal standard. In order to sustain the jury's conviction, the state court was not required to find incontrovertible evidence that Ayala was near Olinder Park before Diaz and Sanchez. The state court's judgment is sufficient if "the circumstances reasonably justify the jury's factual findings." *Medina*, 46 Cal.4th 913, 924, fn. 2. Here, it did. The cell phone testimony shows that (i) petitioner and Diaz exchanged several calls in the minutes leading up to the murder and (ii) Ayala's outbound calls were routed through the cell phone tower closest to Olinder Park before Diaz's calls were routed through that tower. This cell phone testimony is sufficient to "reasonably justify" a finding that Ayala was in the vicinity of Olinder Park before Sanchez and Diaz arrived.

Assuming *arguendo* that Ayala was in fact on the move when he made and received the cell phone calls at issue, the cell phone testimony shows that all such calls were made in the vicinity of Olinder Park. The fact that some of Ayala's calls were routed through different cell phone towers does not negate the possibility that he had arrived at Olinder Park before Sanchez and Diaz. This evidence is entirely consistent with a finding that Ayala arrived at Olinder Park before Sanchez and Diaz, and then instructed Pipkin to drive around looking for Sanchez and Diaz as the principals fled after the murder.

Thus, the Court of Appeal reasonably determined that there was substantial evidence to support petitioner's conviction. The petition is denied on these grounds.

**V.   CONCLUSION**

For the foregoing reasons, the Court **SETS ASIDE THE VERDICT** and **REMANDS FOR A NEW TRIAL.**

**IT IS SO ORDERED.**

Dated: October 11, 2017

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**